**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
SHRED-IT USA, INC.,

                                    Plaintiff,                    **FINDINGS OF FACT AND**
                                                                  **CONCLUSIONS OF LAW**

              - against -                                         CV 02-4082 (JO)

DAVID P. BARTSCHER, et al.
                                    Defendants.
---------------------------------------------------------X

**JAMES ORENSTEIN, Magistrate Judge:**

          Plaintiff Shred-It USA, Inc. ("Shred-It") filed a complaint alleging five causes of action

against defendants David P. Bartscher ("Bartscher") and Data Shredding Service, Inc. ("DSS").

Count One alleged that Bartscher breached his contract with Shred-It, Count Two asserted that

both defendant tortiously interfered with business relations, Count Three accused both

defendants of misappropriating trade secrets, Count Four claimed that DSS interfered with the

contract between the other two parties, and Count Five recited a claim for preliminary and

injunctive relief based on the foregoing causes of action.  Docket Entry ("DE") 1 ("Complaint").

After an evidentiary hearing on July 31, 2002, the Honorable Denis R. Hurley, United States

District Judge, preliminarily enjoined Bartscher from breaching the Agreement.  *See* DE 10.

Judge Hurley later granted Shred-It's motion for summary judgment as to the breach of contract

claim, but denied the request for summary judgment as to damages on that claim or on the merits

of the other causes of action.  DE 40.  With the parties' consent, DE 62, I presided over a non-

jury trial of the remaining claims on February 23, 2005.  Upon review of all the evidence and the

parties' post-trial submissions, I now decide that Shred-It has proven no damages and therefore

cannot prevail on its breach of contract claim, and I further grant judgment in favor of the

defendants on all of the remaining claims.

I.    Findings of Fact

A.    Shred-It

Shred-It is a provider of shredding services.  Much of its business consists of mobile, on-site shredding, meaning that the company sends a truck carrying industrial shredders to a customer's location, shreds the client's data (paper as well as other media), and then gives the client a certificate of destruction.  DE 80 (Transcript of Trial, or "Tr.") 18, 83.  Shred-It also provides off-site shredding at a client's request, but that service represents a small part of the company's business and is not a primary focus of its sales representatives.  Tr. 58, 64.  Shred-It charges its client according to the time spent shredding, at a rate of $4.95 per minute.  Tr. 56.

Shred-It secures most of its business through the efforts of sales representatives.  Tr. 19.  The company trains those representatives in a variety of ways, including videos and manuals, personal guidance from sales managers and other sales representatives, and a three-to-five-day training course at its corporate headquarters in Toronto, Canada.  Tr. 20.

Shred-It's sales representatives seek customers through a variety of methods, including unsolicited visits and telephone calls to potential customers, making appointments with potential customers, referrals from other clients, and direct mailings, although the latter has met with only limited success.  Tr. 20, 23-24.  In addition, three or four times a year, Shred-It makes use of commercially available "potential customer lists."  Tr. 49-50.

Like other companies that offer shredding services, Shred-It targets its sales efforts at several industries, including health care, law, financial services, banking, and education.  Tr. 52-53.  Such efforts appear to be scattershot, at least to some degree:  the evidence demonstrates

that Shred-It sent a direct mail solicitation to the attorney representing defendant DSS' counsel. Tr. 51-52 & Ex. A.[1]

One of Shred-It's large clients was the law firm of White & Case LLP ("White & Case"). Tr. 28. White & Case became a Shred-It client in May 1999 and remained such through June 2002. Tr. 29 & Ex. 5 (Shred-It's White & Case invoice).

Shred-It encourages its sales representatives to secure approximately three accounts per week. Tr. 20. Achieving that goal typically requires a sales representative to make approximately 150 telephone calls and 50 "cold calls," or unsolicited visits to potential customers' offices. Tr. 21. From these 200 solicitations, about a dozen typically result in a substantive meeting with a potential customer, and out of those dozen meetings the sales representative typically secures one to three accounts. *Id.*

Shred-It maintains a client database that lists each customer's name, local contact, phone number, and information about pricing, equipment and routing. Given the small percentage of solicitations that actually result in business for Shred-It, knowledge of the identity of those customers who have chosen to use shredding services is a valuable commodity, access to which would give a competitor the advantage of being able to target its sales efforts far more efficiently. To avoid ceding an advantage to its competitors, Shred-It therefore restricts access to its client database to sales representatives and certain other employees; the client information is not available to the public. Tr. 24-26.

---

[1] The "Dear Patrick" letter to counsel is undated but by its reference to Shred-It's fifteenth anniversary in 2003, appears to have been sent after the start of the instant litigation. To assure that counsel for DSS was not laboring under a conflict of interest, I inquired of witness Michael Sheehan, general manager of Shred-It's New York branch office, as to whether his firm had ever become Shred-It's client. He answered in the negative. Tr. 52.

B.    <u>Bartscher's Employment With Shred-It</u>

Bartscher began working for Shred-It as a sales representative on February 12, 2001.  Tr. 73.  On the same date, he executed a "Non-Disclosure and Non-Competition Agreement." Tr. Ex. 1 (the "Agreement").  Shred-It requires all of its employees to sign such a contract.  Tr. 19. Bartscher's employment with Shred-It ended on August 12, 2001.  Tr. 73.

Reproduced below are several provisions of the Agreement,  as executed by Shred-It and Bartscher, that are at issue in this litigation.  While additional portions of the Agreement may have some bearing on the propriety of Bartscher's conduct, the Complaint asserts a breach of contract only with respect to the provisions of the "Third" paragraph.  Accordingly, notwithstanding Shred-It's post-trial description of other substantive provisions as "relevant," see DE 77 at 3-4 (and its telling omission of the precise language of the paragraph on which it seeks to rely for purposes of establishing liquidated damages), I reproduce here those paragraphs pertinent to the finding of breach and to the question of damages.

**<u>THIRD:</u>**

Employee acknowledges and agrees that, during Employee's term of employment and in the event  Employee's employment should end for any reason, Employee will not:

    A.    Directly or indirectly compete with Company in any mobile document destruction business in the service area of NYC; Long Island for a period of one year following the date [Employee's] employment ends.

    B.    Solicit any such customer or prospective customer whom Employee came to know by virtue of Employee's employment with Company for a period of one year following the date employment ends.

C.      Undertake any employment or activity in the mobile document destruction business in which the loyal and complete fulfillment of the duties of the employment or activity would call Employee to reveal, make judgments on, or otherwise use any Confidential Business Information to which Employee was given while employed by Company.

D.      Disclose to any third party the Confidential Business Information or trade secrets of Company.

**FOURTH:**

If, at any time within one (1) year after the termination of Employee's employment with Company, Employee directly or indirectly solicits or provides services, which Company provides, to any customer of Company, Employee shall immediately purchase from Company the business and goodwill associated with such customer. In view of the difficulty in evaluating goodwill, it is hereby agreed that the price of said goodwill shall be measured by three (3) times the annual billing by Company and/or its employees in servicing such customer during the 12-month period immediately preceding the date of termination but in no event, less than ten thousand dollars ($10,000.00) for each such customer. It is mutually agreed that after Company notifies Employee of the amount due, in writing, this amount will be paid by the Employee to the Company over a five (5) year period of time with 20% down and the balance due in 60 equal payments, due on the first (1st) of every month, including interest at 7% per annum (or upon written demand by the Employer). If any monthly installment under this Agreement is not paid when due and remains unpaid after a date specified by a notice to the Employee, the entire principal amount outstanding and accrued interest thereon shall at once become due and payable at the option of the Company. The date specified in the notice shall not be less than (30) days from the date such notice is mailed. The Company may exercise this option to accelerate during any default by the Employee regardless of prior forbearance. If suit is brought to collect this Note [sic], the Company shall be entitled to collect all reasonable costs and expenses of suit, including, but not limited to, reasonable attorneys' fees. This provision shall not be deemed a waiver of any rights of the Company against the Employee for breach of this Agreement or for any injunctive relief and is a remedy in addition to any other remedies available to the Company, including the remedies in Section Tenth.

**TENTH**

Remedies for Violations of the Non-Disclosure and Non-Competition Agreement:

...

b. It is expressly agreed that Company may affirmatively exercise its rights to file an action in any court . . . to remedy any breach of the restrictions in Sections Second through Ninth of this Non-Disclosure and Non-Competition Agreement. Remedies for damages occurring prior to Company's knowledge of a breach, until action in breach of the Agreement stop, and related in any way to the effects of the breach, shall include, but not limited to, monetary damages, liquidated damages, attorney's fees and other costs related to said actions. Remedies to stop continuing the future damage from actions in breach of the Agreement occurring after Employee has knowledge of the breach shall include, but not be limited to, a temporary restraining order without prior notice; a preliminary injunction prior to trial; an injunction for full relief after [trial]; attorney's fees and other costs related to such actions.

...

Tr. Ex. 1.

Bartscher claims he did not access the client database while he was employed at Shred-It, but did remember the names of certain clients that he obtained on the company's behalf. Tr. 78-79. He denied having known, while employed at Shred-It, that White & Case was a Shred-It client; White & Case was located within Bartscher's sales territory but he had no contact with the firm at that time. Tr. 93-94. Bartscher claims to have become aware of White & Case's location and status as a Shred-It client only as a result of this lawsuit. Tr. 94. On the other hand, Joseph Villani ("Villani") testified at the preliminary injunction hearing, that he personally observed Bartscher access the database, and knew that Bartscher was aware that White & Case was a client because he specifically referred to it as such. Transcript of Hearing dated July 31, 2002 ("H. Tr.") 46, 59, 68. Although I did not personally observe Villani's testimony, and although each

witness had an interest in the outcome of the case that may have influenced his recollection of the events,[2] Bartscher's testimony at the preliminary injunction hearing about his use of computers was inconsistent, *see* H. Tr. 160; and the proposition that he would be unaware of White & Case's status as a client seems less likely and less reasonable than Villani's assertion to the contrary.  I therefore find that Bartscher knew White & Case was a Shred-It client.

      B.     <u>Bartscher's Employment With DSS</u>

      DSS is a competitor of Shred-It; it provides similar services in the same geographic area, i.e, New York.  Tr. 27, 60, 64.  DSS provides both mobile and off-site shredding; for the former service, DSS charges $200 for the first hour and $100 per hour thereafter, with chargeable time measured in 15 minute increments.  Tr. 103.

      Bartscher began working for DSS on February 11, 2002.  Tr. 79.  When he was hired, Bartscher mentioned that he had previously worked for Shred-It but did not mention the non-competition agreement.  Tr. 81, 101.  Bartscher responsibilities as a sales representative at DSS were the same as those at Shred-It.  Tr. 76, 81.

      One of the ways Bartscher sought to get business for DSS was a "generic mailer."  Tr. 82; *see* Ex. 2.  The generic mailer (akin to the letter Shred-It sent to a number of law offices including counsel for DSS, *see* Ex. A), reads as follows, in relevant part:

---

[2]  Villani was employed by Shred-It at the time of his testimony.  H. Tr. 19.  That he later left the company and became its adversary in a separate lawsuit, *see* DE 82, is of no moment.  To the extent that he may have had an incentive at the time of the bench trial to recant and thereby harm Shred-It's case, he had a countervailing incentive to avoid exposing himself to such accusations as might arise from a change of testimony.

Dear Colleague:

Security is the watchword for the New Millenium.  Many companies are looking for a cost effective, highly secure method of document destruction.  Our team at **Data Shredding Service** is here to help you.  We are the innovators of on and off site document shredding.

...

And by the way, if you are currently using this type of service and you are tired of missed appointments and escalating prices, give us a call, we will be glad to give you a free quote.  You'll be amazed at how much money you can save.

Tr.  Ex. 2 (emphasis in original).  Bartscher began sending the generic mailer to prospective customers within two or three weeks of beginning his employment with DSS.  Tr. 84.  He admitted sending them out "all the time."  *Id.*

Bartscher admits that he did not "entirely" honor his non-competition agreement.  Tr. 74.  He occasionally contacted prospective clients that he either knew or later learned were Shred-It customers.  Tr. 96.  He explained his conduct by asserting that shredding companies "all try to contact the same people."  *Id..*

By letter dated May 7, 2002, Shred-It's counsel advised DSS of Bartscher's former employment with Shred-It and the terms of the Agreement.  Tr.  Ex. 3.  In another letter of the same date, Shred-It's counsel gave similar advice to Bartscher.  Tr.  Ex. 4.[3]

Upon receiving the letter from Shred-It, Kevin Montera ("Montera"), who is an owner and officer of DSS, asked Bartscher if he had any trade secrets, proprietary information, or

---

[3]  For several months between the end of his employment at Shred-It and the start of his work for DSS, Bartscher worked as a sales representative for yet another shredding services company called Mobile Data Shredding, located in Bronx, New York.  Bartscher claims he was told that Shred-It was aware of his employment there (though the record is silent as to whether what he was told was correct), but never received any complaint from Shred-It that his work for Mobile Data Shredding violated the Agreement.  Tr. 100-101.

customers lists; Bartscher said he did not.  Tr. 103, 113.  Montera then instructed Bartscher to stay away from Shred-It customers and concentrate on off-site shredding.  Tr. 113.

Bartscher's receipt of the letter did not affect the way he conducted business for DSS.  Tr. 88.  In June or July 2002, Bartscher sent the generic mailer to White & Case and the law firm retained DSS shortly thereafter.  Tr. 84.

### D.    The Value Of The White & Case Account

Shred-It's services to White & Case ended by June 27, 2002.  Tr. 29.  Although the record is not clear as to whether there was any overlap, it appears that the law firm stopped using Shred-It for mobile shredding services and started obtaining such services from DSS almost immediately thereafter.  There is no evidence in the record of any other Shred-It client that similarly transferred its business to DSS after receiving a solicitation from Bartscher.

There is no evidence (other than hearsay and opinion, on which I place no reliance, *see* Tr. 102, 106) as to why White & Case decided to shift its custom from Shred-It to DSS.   Neither party called any witness from White & Case.  Shred-It's witness did not know if White & Case had voiced any complaints, could not say whether White & Case had any commitment to remain Shred-It's customer for any period of time, and could identify neither Shred-It's contact at White & Case nor the Shred-It employees responsible for providing service to White & Case.  Tr. 38-39, 46-47.  In short, there is no basis for saying how long, if at all, White & Case would have remained Shred-It's customer after the end of June 2002 in the absence of Bartscher's solicitation.  Tr. 45-46.  Nor is there any information in the record as to how, if at all, White & Case communicated to Shred-It its decision to stop using the latter's service, or what explanation, if any, it offered for that decision.  *See* Tr. 69-70.

From May 1, 1999 through June 27, 2002, Shred-It earned a total of $111,692.50 in revenue from White & Case. In the twelve-month period preceding Bartscher's termination, Shred-It billed White & Case a total of $42,147.41. Tr. 29; *see* Ex. 5. There is no evidence as to whether that billing accurately reflected the shredding services provided. *See* Tr. 40.

Under the formula set forth in the Fourth paragraph of the Agreement, if Bartscher is required to purchase the goodwill associated with the White & Case account, that asset is to be assigned a value of the greater of $10,000 or thrice the annual billing amount for the twelve-month period preceding Bartscher's termination. That formula results in a goodwill valuation of $126,442.23 for purposes of the instant dispute.

The Agreement states that an employee's obligation to purchase goodwill pursuant to the requirement recited in the Fourth paragraph arises when "after [the] Company notifies [the] Employee of the amount due, in writing ...." Tr. Ex. 1. There is no evidence that Shred-It ever sent such a notice to Bartscher with respect to White & Case. *See* Tr. 71-72. The same provision of the Agreement further states that an employee who is under an obligation to purchase a client's goodwill may pay the purchase price in installments over a five-year period, with interest accruing at an annual rate of seven percent, unless he defaults on any portion of the payment. Tr. Ex. 1. If he does, Shred-It can trigger an obligation to pay the entire principal and all accrued interest in one lump sum by sending a further notice. The record contains no evidence of the latter notice having been sent, either.

Shred-It's actual profit from its servicing of White & Case cannot be determined with any certainty from the evidence in the record. Shred-It estimates that its average profit margin for all customers is twelve percent, and further estimates that the margin for any particular account may

be as low as nine percent and as high as fifteen percent. Tr. 30-31. However, there is simply nothing in the record showing that estimate to be anything more than speculation. In particular, Shred-It provided no evidence as to any of the actual expenses associated either with the White & Case account specifically or with running the business as a general matter. *See* Tr. 29-30, 37, 47, 66.

Although Shred-It's estimate of actual lost profits is too speculative to support a finding of fact, it does provide a useful perspective on the relationship between the goodwill purchase price specified under the Agreement's Fourth paragraph and the actual value of having White & Case as a client. During the entire 38-month period that White & Case was a client, during which the total billing amount was $111,692.50, Shred-It by its own estimate could have earned a profit no greater than $16,753.88; the profit may have been as low as $10,052.33. It is therefore apparent that the formula for evaluating the price of the White & Case goodwill produces a value far in excess of any profit that Shred-It believes it may have earned from the White & Case account – or that it may have lost following the firm's defection to DSS.

II.    Conclusions Of Law

    A.    Preliminary Matters

        1.    Jurisdiction And Choice Of Law

The parties are citizens of different states (Shred-It is incorporated in Canada and both defendants are from New York) and the amount in controversy exceeds $75,000. Subject matter jurisdiction therefore exists pursuant to 28 U.S.C. § 1332. The parties agree that their dispute is governed by the substantive law of New York, where all of the relevant events occurred.

## 2. The Effect Of Prior Rulings

A "decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *In re PCH Assoc.*, 949 F.2d 585, 592 (2d Cir. 1991) (citations omitted). The law of the case doctrine thus applies to Judge Hurley's grant of partial summary judgment on the first cause of action, as discussed further below. As to all other matters, however, and in particular as to all of the findings Judge Hurley made at the preliminary injunction hearing, I am not bound. Such findings, made against the background of a legal standard that required Shred-It to establish only a likelihood of success on the merits, "do not preclude reexamination of the merits at a subsequent trial." *Irish Lesbian and Gay Org. v. Giuliani*, 143 F.3d 638, 644-45 (2d Cir. 1998) (citations omitted).

## 3. Shred-It's Legal Status And Standing

In a letter dated May 17, 2005 Bartscher questions the existence of Shred-It as a legal entity, and therefore questions whether it can seek to enforce the Agreement. DE 81. In a response dated July 14, 2005, Shred-It speculated that Bartscher received direction from defendants in another case, *Shred-It USA, Inc. v. Confidential Shredding, LLC*, CV 03-1816 (ERK) (MDG). DE 82. Shred-It also attached a decision by the Honorable Edward R. Korman, Chief United States District Judge, rejecting similar arguments by the defendants in the later case (one of whom, Joseph Villani, testified on Shred-It's behalf at the preliminary injunction hearing in this case). *See* DE 82, Attachment (*Confidential Shredding, LLC*, CV 03-1816, slip op. (E.D.N.Y. June 1, 2005)) at 13-14. I concur with Judge Korman's decision and reject the argument that Shred-It lacks standing to sue for enforcement of the Agreement. I therefore address the merits of each cause of action in turn.

B.       Breach of Contract

Judge Hurley granted in part Shred-It's motion for summary judgment on the breach of contract claim.  Specifically, he found that Bartscher breached the Agreement, but added that the latter conclusion "does not end the Court's inquiry...."  DE 40 at 10.  He declined, however, "to set damages at this time" and decided instead to "revisit the question of damages at such time as the entire action is concluded."  *Id.*  I am therefore bound by the law of the case doctrine only with respect to the determination that Bartscher breached the Agreement.  I am not bound, however, to find that Shred-It is entitled to judgment in its favor on the cause of action, and merely inquire without further analysis into the amount of damages to be awarded.

Because Judge Hurley did not decide the issue of damages, he did no more than grant summary judgment as to certain *elements* of the contract claim.  He cannot have made a determination that Shred-It is entitled to *judgment* in its favor on the first cause of action, because proof of damages is an essential element of such a claim under New York Law.  "To establish a *prima facie* case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *National Market Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (citing *RIJ Pharm. Corp. v. Ivax Pharms., Inc.*, 322 F. Supp.2d 406, 412 (S.D.N.Y.2004); *First Investors Corp. v. Liberty Mut. Ins. Corp.*, 152 F.3d 162, 168 (2d Cir. 1998)); *see also LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d. Cir. 1999) ("Under New York law ... '[t]he failure to prove damages is ... fatal to [a] plaintiff's breach of contract cause of action.'") (quoting *Cramer v. Spada*, 610 N.Y.S.2d 662, 664 (3d Dep't 1994)).  I therefore assume a breach of the Agreement and turn to the question of damages not simply to determine the

amount that Shred-It is owed, but to determine the threshold issue of whether it is entitled to any judgment at all.

Shred-It seeks recovery against Bartscher under three theories: the Agreement contains a liquidated damages provision; Bartscher's breach resulted in actual damages properly measured by lost profits; and the Agreement provides for an award of attorneys' fees as partial remedy for a breach. I address each theory in turn.

    1.    <u>Liquidated Damages</u>

    a.    <u>What Liquidated Damages Clause?</u>

Shred-It claims that it is "entitled to recover liquidated damages pursuant to Paragraph 4 of the Agreement." DE 77 at 13. That assertion rests on an assumption that the goodwill purchase provision in the Fourth paragraph of the Agreement is indeed a liquidated damages provision that the parties intended to apply to Bartscher's breach of his obligations under the Third paragraph, which is the only contract breach alleged in the Complaint. That assumption is unfounded.

"New York courts will construe a purported liquidated damages provision strictly...." *U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co.*, 369 F.3d 34, 71 (2d Cir. 2004) (citing *Elmira v. Larry Walter, Inc*., 76 N.Y.2d 912, 913-14 (1990) (*mem*.)). It is therefore incumbent on Shred-It to demonstrate that the terms of the Fourth paragraph are clearly meant to apply in this case – and it is decidedly not the defendants' burden to disprove the proposition, notwithstanding Shred-It's entirely inappropriate attempt to read such a rule into the reversal of a grant of summary judgment in *P.J. Carlin Constr. Co. v. City of New York*, 399 N.Y.S.2d 13, 14 (1st Dep't 1977). Shred-It cannot meet its burden.

Bartscher breached the Third paragraph of the Agreement.  The remedies for "any breach of the restrictions in Sections Second through Ninth ... shall include, but not be limited to, monetary damages, liquidated damages, attorney's fees and other costs related to said [remedial] actions."  Agreement at 3.   The question thus becomes whether the goodwill purchase provision in the Fourth paragraph defines the "liquidated damages" to which the Tenth paragraph refers.

Nothing in the Fourth paragraph (or the Tenth) makes such a link explicit.  That alone might be sufficient under New York law to defeat Shred-It's argument, but there is more.  Specifically, the Fourth paragraph establishes a procedure by which Shred-It can avoid the need to establish a breach of contract in court, and simply notify a former employee of its legally enforceable obligation to purchase an asset at a price defined by a certain formula.  Moreover, that enforceable agreement to purchase the asset is itself an obligation the breach of which can lead to a contract claim in court and the imposition of the remedies set forth in the Tenth Paragraph.   Indeed, the Agreement plainly contemplates a separate lawsuit for a violation of the asset purchase provision of the Fourth paragraph:  the clause has its own provision for fees and costs – separate from that in the Tenth paragraph – that takes effect "[i]f suit is brought to collect this Note" (*i.e.*, the employee's debt for purchase of a client's goodwill).  Agreement at 2.  Finally, the Agreement itself is explicit in stating that the asset purchase agreement in the Fourth paragraph is distinct from the remedies set forth in the Tenth paragraph, and not one of the latter: "This provision ... is a remedy *in addition to* any other remedies available to the Company, including the remedies in Section Tenth."  *Id*. (emphasis added).

It may well be that Shred-It fully genuinely believed that the Agreement, as written, would allow it to treat the Fourth paragraph as a liquidated damages provision that would apply

-15-

in circumstances such as those that now obtain. It may also be that Bartscher had the same expectation, and may simply have been cavalier about his obligations under the non-competition agreement and the potential risks of violating it. The proposition is an entirely reasonable one and is certainly supported by evidence in the record. *See* H. Tr. 44-45. But New York law does not permit me to look beyond the contract at such parol evidence to sustain Shred-It's view that the asset purchase agreement should be applied in circumstances beyond those explicitly referenced in the Fourth paragraph. Nor does the law allow me to infer that the Fourth paragraph should apply here because the reference to "liquidated damages" in the Tenth paragraph would otherwise be meaningless. Rather, I must strictly construe the purported liquidated damages clause to see if it "contain[s] clear and unambiguous language, as it should, indicating that it was also intended to apply" to the breach of the Third paragraph now in issue. *City of Elmira*, 76 N.Y.2d at 914. Because it does not, I cannot construe the terms of the asset purchase agreement in the Fourth paragraph to be a liquidated damages provision that applies in this case.

b.  <u>Shred-It Has Not Sent The Required Notices</u>

Even if I were to apply the purported liquidated damages provision, Shred-It would lose. By its explicit terms, the provision would not require Bartscher to pay the sum Shred-It now seeks until two conditions had been satisfied. First, Shred-It would have had to send Bartscher a notice "of the amount due, in writing" for the purchase of the goodwill associated with the White & Case account. Agreement at 2. That would have obliged Bartscher to pay one-fifth of the claimed amount, and to start making monthly payments of the balance at an annual interest rate of seven percent. Second, Bartscher would have had to default on a payment, and Shred-It would then have had to send a second "notice" specifying a date at least thirty days later on which the

entire balance and accrued interest would be due.  *Id*.  Neither notice was sent, and Bartscher has

therefore never been obliged to pay the amount Shred-It now seeks.

c.     The Purported Liquidated Damages Provision Is Unenforceable

Finally, even if the terms of the Fourth paragraph could properly be considered a

liquidated damages provision, and even if Shred-It had taken the steps necessary to invoke it, I

would still hold it unenforceable because it is impermissibly punitive.  Under New York law, a

liquidated damages provision "is an estimate, made by the parties at the time they enter the

agreement, of the extent of the injury that would be sustained as a result of breach of the

agreement."  *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (1977)

(citation omitted).  Such a provision is enforceable if it is neither unconscionable nor contrary to

public policy.  *Id.* (citation omitted).  On the other hand, a provision that prescribes an award that

is "grossly disproportionate to the amount of actual damages" merely secures performance for

"fear of economic devastation" and is therefore unenforceable.  *Id.* (citation omitted).  Permitting

parties, "in their unbridled discretion, to utilize penalties as damages, would lead to the most

terrible oppression in pecuniary dealings."  *Id.* (citations and internal quotation marks omitted).

Shred-It certainly "has a legitimate interest in preventing former employees from

exploiting or appropriating the goodwill of a client or customer."  *BDO Seidman v. Hirshberg*, 93

N.Y.2d 382, 392 (1999) (citations omitted).  Moreover, I accept for the sake of argument that the

goodwill of a client like White & Case is inherently difficult to measure (although the

proposition seems counterintuitive given Shred-It's ability to describe – and likely therefore to

monetize – the burdens associated with obtaining and retaining customers).  But that does not

justify the triple-billings formula at issue here.  Rather, I can sustain the formula as a proper

liquidated damages provision only if it satisfies two elements: it must not only serve as a proxy for a type of actual loss that is not amenable to precise estimation, but it must also produce a result that is reasonably proportional to the probable loss. *Truck Rent-A-Center*, 41 N.Y.2d at 425 (citations omitted).

Shred-It has done nothing to sustain its burden on the latter requirement. Moreover, to the extent the record has relevant evidence, it undermines Shred-It's case. As noted above, even under its own self-serving estimate, Shred-It's profits from providing service to White & Case for 38 months was no more than $16,753.88, which translates to an annual profit of $5,290.70. The purported liquidated damages provision would require Bartscher to pay $126,442.23 – or almost 24 years worth of profits, without any discount for having to provide the sum all at once rather than over the 24 years Shred-It would otherwise have to wait, even assuming it would have kept the account at similar billing and profit levels for so long.[4] While it may be true that the value of goodwill associated with Shred-It's clients is difficult to measure with any precision, it is patent that the formula Shred-It insists having its employees accept is not proportional to its probable loss. Webster's defines "goodwill" as "the favor or advantage in the way of custom that a business has acquired beyond the mere value of what it sells whether due to the personality of those conducting it, the nature of its location, its reputation for skill or promptitude, or any other circumstance incidental to the business and tending to make it permanent." Webster's Third New International Dictionary Unabridged (Merriam Webster Inc. 2002) 979. Even assuming that

---

[4] In fairness to Shred-It, I have assessed proportionality based on the highest lost profits figure that its estimates would support, so as to achieve a result closest to the claim for liquidated damages. I note however that the amount Shred-It believes it has proved as lost profits, $13,403.10, *see* DE 77 at 21, is even lower, and is therefore even less proportional to the liquidated damages claim.

Bartscher's mailer had some causal connection to White & Case's decision to switch shredding services providers, it can hardly have caused goodwill that was truly worth tens of thousands of dollars to evaporate in an instant. The triple-billings formula is thus plainly punitive and cannot be enforced.

2.    Lost Profits

As a fall-back to reliance on the purported liquidated damages provision, Shred-It claims that it can recover its lost profits from the White & Case account. Such a theory requires Shred-It to prove first that the allegedly lost profits constitute damages caused by Bartscher's breach, second that such lost profits are capable of being proved with reasonable certainty, and third that such a measure of damages was within the parties' contemplation at the time they entered into the Agreement. *Kenford Co. v. Erie*, 67 N.Y.2d 257, 261 (1986) ("*Kenford I*"); *Kenford Co. v. Erie*, 73 N.Y.2d 312, 319 (1989) ("*Kenford II*").

The claimed damages may not be "speculative, possible, ... imaginary[,] . . . remote[,] or the result of other intervening causes." *Kenford I*, 67 N.Y.2d at 261 (citations omitted). They must instead be directly traceable to the breach. *Id*. They need not be determined with absolute certainty or mathematical precision, but they must be susceptible to measurement based on known reliable factors without undue speculation. *Ashland Mgm't Inc. v. Janien*, 82 N.Y.2d 395, 405-406 (1993). Finally, as to the third element, courts should take a "common sense" approach to determining whether damages were within the reasonable contemplation of the parties, by considering the nature, purpose and particular circumstances of the contract known by the parties, as well as the risks that defendant foresaw or should have foreseen at the time of contract.

*Kenford II*, 73 N.Y.2d at 319 (citations omitted); *Ashland*, 82 N.Y.2d at 403 (citations omitted); *see Schonfeld v. Hilliard*, 218 F.3d 164, 172-73 (2d Cir. 2000).

There is no evidence of causation in the record. Bartscher sent his generic mailer to White & Case in June or July 2002, and White & Case started using DSS during the second of those two months. But why White & Case discontinued its at-will relationship with Shred-It is something the company has not even attempted to prove, and has ignored in its post-trial submission. Indeed, Shred-It's sole trial witness conceded that he had no way of knowing in June 2002 whether White & Case would have remained a client "for another day or another three years." Tr. 45-46.

As to the second element, I have no doubt that lost profits are capable of being proved with reasonable certainty. But they have not been so established here. To the contrary, I have been given nothing but conclusory, unsupported aggregate estimates about Shred-Its thousand or so clients and an equally conclusory and unsupported claim that it is impossible to establish the actual level of profits it earned from this one customer. Given the ingredients of Shred-It's expenses to which its witness testified, the absence of proof on this score appears more attributable to lack of effort than to impossibility. For example, Shred-It does maintain a mileage log for its trucks that is broken down by customer – but it did not seek to offer that information in evidence. Tr. 48.

Likewise, Shred-It has done nothing to show that the parties contemplated lost profit damages at the time they entered into the Agreement. Instead, it merely offers the *ipse dixit* that it has succeeded in making such a showing by a preponderance of the evidence and, somewhat

inconsistently, faults Bartscher for failing to offer any evidence to the contrary. DE 77 at 20-21.

Such argument does not substitute for evidence.

In short, the evidence in the record does not permit me to award Shred-It the $13,403.10

it seeks in lost profits. Because there is no other evidence in the record of actual damages, I must

conclude that Shred-It has failed to prove the element of damages, and therefore cannot sustain

its burden of proof on the cause of action alleged in Count One.

### 3. Attorneys' Fees

New York law provides that "attorneys' fees are the ordinary incidents of litigation and

may not be awarded to the prevailing party unless authorized by agreement between the parties,

statute, or court rule." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003)

(citations omitted); *see Culinary Connection Holdings, Inc. v. Culinary Connection of Great

Neck, Inc.*, 1 A.D.3d 558 (2d Dep't 2003). Because Shred-It has failed to prove actual damages,

and cannot rely on what it describes as the liquidated damages provision, Shred-It cannot

establish an essential element of its breach-of-contract claim, and therefore cannot be considered

the "prevailing party." As a result, it cannot recover attorneys' fees.

Nor can Shred-It cure its failure to prove the damages element of its contract claim by

bootstrapping its request for fees into a showing of damages. Subsection (b) of the Agreement's

Tenth paragraph provides as follows:

> *Remedies* for *damages* occurring prior to Company's knowledge of a breach, until
> action in breach of the Agreement stop, and related in any way to the effects of the
> breach, shall include, but not limited to, monetary *damages*, liquidated *damages*,
> attorney's *fees* and other costs related to said actions.

Tr. Ex. 1 at 3 (emphasis added).

The quoted language distinguishes between "damages" – that is, the harm actually or constructively caused by a breach – and the larger category of "remedies" that the parties agree are recoverable upon a showing of breach. Attorneys' fees are plainly the latter; or, at a minimum, any argument that they are not would require much more explicit contractual language to succeed. *See Oscar Gruss & Son*, 337 F.3d at 199 ("while parties may agree that attorneys' fees should be included as another form of damages, such contracts must be strictly construed to avoid inferring duties that the parties did not intend to create") (citing *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 491 (1989)).

Shred-It cannot recover fees unless and until it can show that it is entitled to judgment on the breach-of-contract claim. Having failed to make that showing, it must be denied judgment on its first cause of action and it must also be denied the remedy of being awarded its attorneys' fees.

C.       Count Two:  Interference With Business Relationships

Shred-It's second cause of action asserts that DSS and Bartscher both interfered with its business relationship with White & Case. In New York, such a claim requires the plaintiff to prove four essential elements:  (1) it had business relations with a third-party; (2) the defendants interfered with those business relations; (3) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendants' acts injured the relationship, thereby causing damages. *Scutti Enter., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003) (citations omitted).

The third element requires a showing of "wrongful means," such as "'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degree[] of economic pressure; they do not however, include persuasion alone ....'" *NBT Bancorp Inc. v. Fleet/Norstar*

*Financial Group, Inc.*, 87 N.Y.2d 614, 624 (1996) (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980)). Applying that standard, the record cannot support a finding that either DSS or Bartscher used "wrongful means" to interfere with the relationship between Shred-It and White & Case. Shred-It therefore has not proven its claim of interference with business relationships.

### D. Count Three: Misappropriation Of Trade Secrets

Shred-It asserts that both DSS and Bartscher misappropriated its trade secrets by making use of its customer list. To succeed on such a claim, Shred-It must prove two elements: first, that it possessed a trade secret; and second, that the defendants used the trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999) (citations omitted). As explained below, this claim also fails.

### 1. The First Element: Existence Of The Trade Secret

A trade secret is "'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.'" *Ashland Mgm't*, 82 N.Y.2d at 407 (quoting Restatement of Torts § 757 cmt. b). Courts determine whether information is a trade secret by examining several factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors: (5) the amount of effort of money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*North Atlantic Instruments*, 188 F.3d at 44 (quoting *Ashland* (citing Restatement of Torts § 757 cmt. b)).

Customer lists are considered a trade secret "where the customers are not known in the trade or are discoverable only by extraordinary efforts ... especially ... where the customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money." *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392-93 (1972) (citations omitted); *see North Atlantic Instruments*, 188 F.3d at 44. On the other hand, such lists do not qualify as a trade secret "where the customers are readily ascertainable outside the employer's business as prospective users and consumers of the employer's services or products." *Id.* at 392 (citations omitted).

It is a close question whether Shred-It's customer list – or, more precisely, the presence of White & Case on that list – is a trade secret. Shred-It takes pains to secure its database against unauthorized access, and given the small proportion of cold calls that produce business, there is clearly a significant value in knowing the identity of businesses that have actually taken the step of purchasing mobile shredding services. However, it appears that any law firm could reasonably be ascertained as a prospective user and consumer of such services without reference to the Shred-It database, as underscored by Shred-It's solicitation of its opposing counsel in this case. On this close question, I find in Shred-It's favor and conclude that its database, and the listing of White & Case therein, is a trade secret.

## 2.  The Second Element:  Use Of The Trade Secret

Although the customer list is a trade secret, Shred-It has failed to show that Bartscher used it in breach of the non-compete agreement or in breach of a duty.  *See North Atlantic Instruments*, 188 F.3d at 47 (agent has a duty not to use confidential knowledge acquired in his employment in competition with his principal) (citations omitted).  The record simply contains no evidence from which I could find a causal connection between Bartscher's access to the customer list and his subsequent inclusion of White & Case among many other potential clients to whom he sent a DSS mailing.  Like Bartscher when he worked for DSS, Shred-It too sent solicitations to a wide array of companies within certain industries known to use shredding services.  *See* Tr.  Ex. 2; Tr. Ex. A.  I can no more say that Bartscher's contact to White & Case was based on his improper use of a trade secret than I can speculate that Shred-It used improper means to identify the recipients of its mailings.  In particular, there is nothing in the record to show that the generic solicitation mailing, Tr. Ex. 2, was sent to the same person at White & Case, or even to the same address, that Bartscher would have found in Shred-It's customer list.  Nor did Shred-It even try to elicit from Bartscher any information about how he selected the potential customers to whom he sent the generic mailers.

I recognize that at the end of the preliminary injunction hearing, Judge Hurley found both that the client database was a trade secret and that Bartscher used it.  H. Tr. 167.  However, as the Judge later made clear in denying summary judgment, his earlier finding was simply a judgment about the likelihood of success, and that "genuine issues of material facts remain[ed]" that precluded summary judgment on the trade secrets claim.  I am therefore free to assess the entire

factual record against the applicable legal standard – a standard that requires Shred-It to prove its case by a preponderance of the evidence. Shred-It has failed to do so.

Accordingly, Shred-It has proved only one of the two essential elements of its trade secrets claim against Bartscher, and therefore cannot prevail against him. As a result, the similar claim against DSS under a theory of *respondeat superior* must likewise fail.

E.      <u>Count Four: Interference With A Contract</u>

To prevail on its claim of interference with a contract under New York, Shred-It must prove the following four elements: (1) the existence of a valid contract, in this case the Agreement; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procurement of the breach of that contract; and (4) damages. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996) (citations omitted); *G.K.A. v. Honickman*, 55 F.3d 762, 767 (2d Cir. 1995) (citing *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90 (1993)).

I find that Shred-It has proved the first two elements by a preponderance of the evidence. Judge Hurley's grant of partial summary judgment with respect to the breach-of-contract claim necessarily included a finding that the Agreement constituted a valid contract, and I am bound to apply that finding as the law of the case (and, in any event, I agree with it). As to the second element, DSS plainly gained knowledge of the contract's existence no later than May 7, 2002, and the record establishes that the solicitation of White & Case in breach of the Agreement occurred in June or July of that year. To the extent that DSS seeks to defeat the claim on the ground that it cannot be held liable unless, contrary to the record, Shred-It could prove its knowledge of the Agreement at the time of Bartscher's hiring, *see* DE 78 at 5, its argument is unavailing. DSS cites no authority supporting its interpretation of the knowledge requirement,

nor has my research found any, and Shred-It cites several cases to the contrary that are persuasive notwithstanding the fact that they all interpret the law of other jurisdictions. *See* DE 77 at 24-25 (citing cases).

Shred-It has not, however, proved the third element of intentional procurement. Although that element, unlike the corresponding element of the interference claim, does not require a showing of wrongful means, *see Guard-Life*, 50 N.Y.2d at 191 ("greater protection is accorded an interest in an existing contract ... than to the less substantive, more speculative interests in a prospective relationship"), Shred-It must establish that "but for the allegedly tortious conduct of [DSS], [Bartscher] would not have breached [the] contract." *Michele Pommier Models, Inc. v. Men Women NY Model Mgm't, Inc.*, 14 F. Supp.2d 331, 335-36 (S.D.N.Y. 1998), *aff'd* 173 F.3d 845 (2d Cir. 1999). Stated differently, "where there is an existing, enforceable contract and a defendant's *deliberate interference* results in a breach of that contract, a plaintiff may recover damages ... even if the defendant was engaged in lawful behavior." *NBT Bancorp*, 87 N.Y.2d at 621 (emphasis added).

Shred-It argues that "intentional procurement," is established because "DSS did not restrict Bartscher from selling shredding or re-assign him to its jointly-owned records storage or moving businesses." DE 77 at 23. The record, however, tells a different story. Once DSS received Shred-It's May 7, 2002 letter, Montera instructed Bartscher to stay away from Shred-It customers and concentrate on off-site shredding. Tr. 113. His testimony in this regard stands uncontroverted and I credit it.

Moreover, I cannot fathom what Shred-It would have had DSS do that would not reach the impermissible level of forbidding Bartscher altogether from working as a sales representative

in the field of mobile shredding services. Shred-It appears to argue that DSS should have been more proactive in determining whether Bartscher was soliciting DSS customers. But it could not effectively have done so without putting Bartscher in the position of saying whether each potential customer under consideration – even those identified as prospects by entirely independent means, such as the purchase of a commercial list – had been a client of Shred-It's. Such interrogation would have occasioned a far more obvious and wide-ranging violation of Bartscher's agreement than the one at issue in this case.

Shred-It has therefore failed to prove the third element of its interference claim. Having done so, it cannot recover from DSS on that claim.

F.    Count Five:  Preliminary And Permanent Injunctive Relief

In its post-trial submission, Shred-It proposes no conclusions of law with respect to Count Five, and proposes a judgment in its favor that is silent as to injunctive relief. *See* DE 77 at 37. In light of the expiration of the non-competition period in the contract, and given Shred-It's failure to prove its other claims, there is in any event no reason to enter an injunction. Accordingly, Count Five must be dismissed.

III.     Conclusion

For the reasons set forth above, I find that Shred-It has failed to prove actual damages resulting from Bartscher's breach of contract and therefore cannot prevail on its first cause of action notwithstanding its success in proving the breach itself.  I further find that Shred-It has failed to prove its claims of interference with business relationships, misappropriation of trade secrets, and interference with a contract and that there is no basis for permanent injunctive relief. I therefore direct the Clerk to enter judgment in favor of the defendants on all counts and thereupon to close this case.

**SO ORDERED.**

Dated: Central Islip, New York                                    /s/ James Orenstein
          September 27, 2005                                        JAMES ORENSTEIN
                                                                   U.S. Magistrate Judge